Merrimack
No. 2006-092

CHERIE L. CZUMAK *& a.*

v.

NEW HAMPSHIRE DIVISION OF DEVELOPMENTAL SERVICES *& a.*

Argued: March 21, 2007
Opinion Issued: May 3, 2007

*Bianco Professional Association*, of Concord (*Denise A. Daniel* on the brief and orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Anne M. Edwards*, associate attorney general, on the brief and orally), for respondent New Hampshire Division of Developmental Services.

*Colliander, Field & Brown*, of Portsmouth (*David S. Brown* on the memorandum of law), for respondent Region 10 Community Support Services, Inc.

GALWAY, J. The petitioners, Cherie L. Czumak, Frank Czumak and Pamela Pendleton, as guardians of Robin Czumak (Robin), appeal an order of the Superior Court (*McGuire*, J.) finding that the respondents, the New Hampshire Division of Developmental Services (DDS) and Region 10 Community Support Services, Inc. (Region 10), complied with the requirements of their stipulated agreement with the petitioners. The respondents cross-appeal the trial court's ruling that DDS must pay arrearages accrued at the facility caring for Robin. We affirm in part and reverse in part.

The record supports the following. Robin has severe developmental disabilities that render her unable to care for her own basic needs. Since 1981, she has been a full-time resident and client of the Institute of Developmental Disabilities, Inc./Crystal Springs School (IDDI) in Massachusetts. Her placement there has been funded by the respondents. In 1998, the respondents determined that Robin should be placed in a New Hampshire facility. The petitioners appealed that decision to the New Hampshire Department of Health and Human Services' Administrative Appeal Unit. During the appeal process, the parties signed a settlement agreement (Stipulation), which became effective in December 2000. The Stipulation stated, in pertinent part:

*I. Introduction*

1. It is the intent of the parties that Robin Czumak will remain at IDDI as long as the facility maintains certification as described herein and the guardians continue to find that IDDI is an appropriate placement fro [*sic*] Robin Czumak. . . . It is the intent of the parties that this agreement constitute a final settlement in this matter . . . .

. . . .

*III. Stipulations*

. . . .

3. The parties further agree that so long as Robin Czumak is eligible for the New Hampshire Medicaid waiver [DDS] shall continue to provide the existing level of services through IDDI that Robin Czumak currently receives. Notwithstanding the above, in the event of a rate increase by IDDI [DDS and Region 10] agree to use their best reasonable efforts to secure additional funding to cover any IDDI rate increase consistent with He-M 503 . . . . If additional funding is not available then [DDS and Region 10] agree to fund respite services at the Medicaid rate for respite services (up to 40 hours per month) to the guardians for any time that Robin Czumak is in the direct care of the guardians and the guardians agree to provide direct care for Robin Czumak for up to eight weeks per year as long as the guardians are physically and financially able to provide such direct care. The parties agree to cooperate in good faith regarding these issues.

After the Stipulation was executed, the Commonwealth of Massachusetts required IDDI to increase its fees to its patients, including Robin. Beginning in 2000, the respondents increased Robin's funding from $95,000 to $100,000 per year. They also made a one-time payment of $5,000 to IDDI in 2002 and a one-time payment of $7,500 in 2003. Despite these increased payments, the respondents did not keep pace with IDDI's increased fees, and arrearages accrued. In April 2003, IDDI notified the petitioners that Robin would be discharged in June 2003 unless the respondents paid the balance due or established a payment plan. IDDI later agreed to allow Robin to stay if the respondents continued making

partial payments and if the petitioners pursued all lawful means, including litigation, to acquire the funds necessary to pay the outstanding balance. By October 2005, the outstanding balance had risen to $101,442.05.

In an attempt to acquire the funds, the petitioners filed a petition in equity for specific performance of the Stipulation. The trial court found that the respondents had complied with their contractual obligations in that they had made good faith efforts to secure additional funding and in that the Stipulation required the respondents to fund rate increases only to the extent that they could reasonably secure additional funding. Despite these findings, the trial court ruled that DDS was responsible to cover the cost of the arrearages to IDDI because it would have been unjust to burden the petitioners with such a cost. Finally, the trial court ordered DDS to pay the cost of maintaining Robin at IDDI for one year, until January 2007, to give the petitioners adequate time to place Robin in another facility.

Both parties appeal. The petitioners argue: (1) the trial court's finding that the respondents acted in good faith and made good faith efforts to find additional funding was not supported by the evidence; (2) under the terms of the Stipulation, a lack of funding did not justify placing Robin in a facility other than IDDI; and (3) the trial court erred by interpreting the Stipulation to mean that the respondents were required to pay for IDDI's rate increases only to the extent that they could reasonably secure additional funding. The respondents argue that the trial court erred in holding DDS responsible for the arrearages to IDDI. We address each issue in turn.

*I. Finding of Good Faith*

The Stipulation provides in part: "[I]n the event of a rate increase by IDDI [DDS and Region 10] agree to use their best reasonable efforts to secure additional funding to cover any IDDI rate increase consistent with He-M 503 .... The parties agree to cooperate in good faith regarding these issues." The petitioners argue that the trial court erred when it found that DDS and Region 10 acted in good faith to use their best reasonable efforts to secure additional funding to accommodate the increased rates at IDDI. This finding was unsupported by the evidence, the petitioners argue, and constituted an unsustainable exercise of discretion.

Findings of fact are binding upon us unless they are not supported by the evidence or are erroneous as a matter of law. *Mahoney v. Town of Canterbury,* 150 N.H. 148, 150 (2003). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party;

it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Harper v. Healthsource New Hampshire*, 140 N.H. 770, 776 (1996) (quotation omitted). Thus, the question before us is whether the evidence supports the trial court's finding that the respondents were faithful to the agreed common purpose that they would use their best reasonable efforts to secure additional funding.

The trial court based its finding upon the following evidence. Matthew Ertas, the administrator of the Bureau of Developmental Services, testified that DDS depends upon the legislature for its funding. In 2004, DDS had to postpone paying over $2,000,000 in bills until the next fiscal year because it did not have enough funding to pay for all of the services to developmentally disabled people that it had committed to pay. The trial court also heard testimony from Dennis Powers, the executive director of the Association of Area Agencies, who testified that, since 1994, there has been a statewide waiting list of more than 200 people with "priority one" status, meaning that their developmental disabilities put them most immediately in need of services. Powers also testified that this waiting list receives an average of 110 new applicants each year. Both Ertas and Powers testified that the respondents' inability to meet the needs of all eligible disabled people results from a lack of funding from the legislature to DDS.

The trial court also considered evidence that, despite the budgetary constraints described above, the respondents increased Robin's allotted funding after IDDI increased its rates. The parties stipulated that, beginning in 2000, the respondents increased Robin's annual funding from $95,000 to $100,000. In 2002, they made a one-time payment to IDDI of $5,000. In 2003, the respondents made a one-time payment to IDDI of $7,500. The trial court found, based upon the parties' stipulated facts, that the amount spent on Robin is more than double the amount allotted for the care of the average developmentally disabled person in New Hampshire. William Dillon, the finance director for Region 10, testified that, despite a deficit in Region 10's operating budget over the past five years, funding for Robin's care has increased by six percent. Such a substantial increase in funding, Dillon testified, is generally only seen in individuals whose needs have drastically changed. Dillon also testified that IDDI's rates have increased by 19 percent since the parties signed the stipulation agreement, and that Region 10 could only meet that rate increase by substantially increasing its deficit.

■ Based upon the facts stated above, the trial court found that the respondents acted in good faith to use their best reasonable efforts to

secure additional funding to cover any IDDI rate increase. Considering this evidence of increased funding for Robin despite budgetary constraints, we cannot conclude that the trial court's finding was unsupported by the evidence or erroneous as a matter of law.

## II. Interpretation of the Stipulation

The petitioners next argue that, even if the respondents used good faith efforts to secure additional funding, a lack of funding did not justify placing Robin in a facility other than IDDI. The petitioners rely upon language in the "Intent" section of the Stipulation, which provides: "It is the intent of the parties that Robin Czumak will remain at IDDI as long as the facility maintains certification . . . and the guardians continue to find that IDDI is an appropriate placement fro [*sic*] Robin Czumak . . . ." They also rely upon language in the "Stipulations" section, which provides:

> If additional funding is not available then [DDS and Region 10] agree to fund respite services at the Medicaid rate for respite services (up to 40 hours per month) to the guardians for any time that Robin Czumak is in the direct care of the guardians and the guardians agree to provide direct care for Robin Czumak for up to eight weeks per year as long as the guardians are physically and financially able to provide such direct care.

The petitioners assert that the above language shows that the intent of the parties was for Robin to remain at IDDI, and that if the respondents could not fully fund Robin's care at IDDI, the only recourse would be for the guardians to care for Robin for up to eight weeks per year and for the respondents to fund the guardians' services at a lower, respite-care rate.

A stipulated agreement is contractual in nature and, therefore, is governed by contract rules. *Public Serv. Co. of N.H. v. Town of Seabrook*, 133 N.H. 365, 370 (1990). The interpretation of a contract is a question of law, which we review *de novo*. *Barclay Square Condo. Owners' Assoc. v. Grenier*, 153 N.H. 514, 517 (2006). When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. *Ryan James Realty v. Villages at Chester Condo. Assoc.*, 153 N.H. 194, 197 (2006). Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract. *Id.*

Reading the Stipulation as a whole, we disagree with the petitioners' assertion that it requires Robin to stay at IDDI even if the eight weeks of respite services are insufficient to mitigate the cost of IDDI's services. The petitioners are correct that, in the Intent section, the Stipulation states the

parties' intent to keep Robin at IDDI, with conditions. The Stipulation also reiterates this intent in the Stipulations section, stating, "The parties further agree that so long as Robin Czumak is eligible for the New Hampshire Medicaid waiver [DDS] shall continue to provide the existing level of services through IDDI that Robin Czumak currently receives." The next sentence in the Stipulation, however, states, "Notwithstanding the above, in the event of a rate increase by IDDI [DDS and Region 10] agree to use their best reasonable efforts to secure additional funding to cover any IDDI rate increase consistent with He-M 503 ...." This sentence sets forth the first step in dealing with any increase in IDDI's rates: the respondents are required only to use their best reasonable efforts to secure additional funding, but are not required to in fact secure additional funding. The second step is set forth in the next sentence of the Stipulation, which states:

> If additional funding is not available then [DDS and Region 10] agree to fund respite services ... to the guardians for any time that Robin Czumak is in the direct care of the guardians and the guardians agree to provide direct care for Robin Czumak for up to eight weeks per year ....

Thus, if the first step of attempting to secure additional funds is insufficient to keep Robin at IDDI, the second step is for her to stay with her guardians, at a reduced cost to the respondents, for up to eight weeks per year. The next sentence in the Stipulation, which is the last sentence that is relevant here, states: "The parties agree to cooperate in good faith regarding these issues." Thus, the Stipulation provides two steps for the parties to take if IDDI increases its rates, but is silent as to what the parties should do if these steps are inadequate to fully fund Robin's care at IDDI, other than providing that the parties should cooperate in good faith.

As described above, the evidence supports the trial court's finding that the respondents acted in good faith to use their best reasonable efforts to secure additional funding, thus fulfilling step one. As for the second step, the petitioners do not dispute the trial court's finding that Robin left IDDI for eight weeks per year in an effort to reduce costs to the respondents. The petitioners do not assert that the respondents acted in bad faith in paying Robin's guardians for eight weeks of respite services. Thus, the parties fulfilled step two. As the respondents have not acted in bad faith regarding either of the steps required by the Stipulation, and as it is silent as to what should occur once both steps are fulfilled, we find no breach of the Stipulation's terms.

*III. Interpretation of Budgetary Constraints*

██ The petitioners' final arguments concern the trial court's consideration of the respondents' budgetary constraints. The petitioners argue that the trial court erred by interpreting the Stipulation as follows: "[T]he Court finds the language in the Stipulation to mean that rate increases at IDDI would be funded by [DDS] and Region 10 to the extent that these agencies could reasonably secure additional funding within a system constrained by a limited budget." The petitioners argue that there is nothing in the Stipulation that limits the respondents' funding to amounts that they can reasonably secure under a limited budget; thus the trial court improperly added the "within a system constrained by a limited budget" language to its interpretation. Further, the petitioners argue that the trial court erred by interpreting the stipulation to mean that the respondents could balance Robin's needs against the needs of other disabled people receiving funds from the respondents. These misinterpretations by the trial court reduced the respondents' obligations under the Stipulation, the petitioners argue.

As stated above, the interpretation of a contract is a question of law, which we review *de novo. Barclay Square Condo. Owners' Assoc.*, 153 N.H. at 517. The Stipulation provides that, if IDDI increases its rates, the respondents "agree to use their best reasonable efforts to secure additional funding to cover any IDDI rate increase consistent with He-M 503 . . . ." We disagree with the petitioners' suggested interpretation of the Stipulation. There is no language in the Stipulation requiring the respondents to either ignore the amount of funding that they have in their budget or to deprive other disabled patients of funds if the funding for Robin falls short due to a rate increase at IDDI. Further, if the intent of the parties were to ignore the limits of the respondents' funding and the needs of other disabled patients, the Stipulation would have simply required the respondents to pay all increases of IDDI's rates, without consideration of their "best efforts." Accordingly, we agree with the trial court's interpretation of the Stipulation.

*IV. Arrearages*

In their cross-appeal, the respondents argue that the trial court erred by ordering DDS to pay both the arrearages to Robin's account at IDDI and the cost of maintaining Robin at IDDI through January 1, 2007. The respondents argue that they used their best reasonable efforts to secure additional funding to cover the IDDI rate increases, and, thus, satisfied their contractual obligations and are not responsible for paying the arrearages owed to IDDI. The petitioners do not explicitly respond to the

respondents' cross-appeal, but have argued throughout their appeal that the respondents failed to comply with their obligation to use their best reasonable efforts to secure additional funding.

The trial court used its equitable powers to order DDS to pay the arrearages owed to IDDI, stating that, although both the petitioners and the respondents complied in good faith with the stipulated agreement, "it would be unjust to burden the petitioners with the cost of the arrearages accrued for Robin's care at IDDI." Because the separation between law and equity is not sharp, courts in New Hampshire have broad discretion in exercising equity jurisdiction. *Blagbrough Family Realty Trust v. A&T Forest Prods.*, 155 N.H. 29, 46 (2007). Trial courts have wide latitude in rendering decisions in equity according to the circumstances of a particular case, and we will uphold their decisions unless they are unsupported by the evidence or erroneous as a matter of law. *Bendetson v. Killarney*, 154 N.H. 637, 647 (2006).

■ As stated above, the interpretation of a contract is a question of law, which we review *de novo*. *Barclay Square Condo. Owners' Assoc.*, 153 N.H. at 517. Shifting the burden of payment under the stipulation to DDS constituted an error of law. The Stipulation, which was signed by the petitioners, the respondents and IDDI, does not require DDS to pay for all arrearages that might accrue if IDDI raises the cost of Robin's care. In the event of a rate increase, the Stipulation requires only that the respondents comply in good faith with the following obligations: (1) "use their best reasonable efforts to secure additional funding to cover any IDDI rate increase"; and (2) "to fund respite services ... to the guardians for any time that [Robin] is in the direct care of the guardians ... for up to eight weeks per year." The plain language of the Stipulation does not bind DDS to pay all increased rates charged by IDDI, but only to pay increased rates to the extent that DDS can reasonably acquire additional funding. Although the trial court concluded that the most equitable outcome was for DDS to pay the outstanding costs, powers of equity do not permit a court to disregard the clearly expressed terms of a contract, *Met Life Auto and Home Ins. Co. v. Lester*, 719 N.W.2d 385, 388-89 (S.D. 2006); *see Chesapeake Bank v. Monro*, 891 A.2d 384, 398 (Md. Ct. Spec. App. 2006), or force upon the parties contractual obligations, terms or conditions that the parties have not voluntarily assumed. *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005); *Goodman v. Newzona Investment Co.*, 421 P.2d 318, 321-22 (Ariz. 1967). Accordingly, we reverse the trial court's order insofar as it required DDS to pay the

arrearages to Robin's account at IDDI and the cost of maintaining Robin at IDDI through January 1, 2007.

*Affirmed in part and reversed in part.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.