Coos
No. 2007-447

HAROLD LASSONDE, III d/b/a MOUNTAIN VIEW CONSTRUCTION

v.

CHARLES STANTON & a.

Argued: April 30, 2008
Opinion Issued: August 15, 2008

*Bouchard, Kleinman & Wright, P.A.*, of Manchester (*Nicholas D. Wright* on the brief and orally), and *John L. Riff, IV*, of Colebrook, on the brief and orally, for the plaintiff.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the defendants.

BRODERICK, C.J. The defendants, Charles and Susan Stanton, appeal a judgment of the Superior Court (*Vaughan*, J.) finding them liable for breach of contract and defamation. The plaintiff, Harold Lassonde, III, doing business as Mountain View Construction, cross-appeals, challenging the amount of damages awarded on his defamation claim, and the trial court's failure to include attorney's fees and interest in his breach of contract award. We affirm in part, vacate in part, and remand.

I

After a bench trial, the trial court found the following facts. In May 2005, the Stantons entered into a contract with Lassonde for the construction of a log home on their land in Pittsburg for the sum of $192,350.79. The contract obligated Lassonde to install a foundation, septic system and well, to assemble the log home, and to complete interior finish work. It called for construction to start by June 1, and for "substantial completion" by December 1. Notably, the contract did not include a "time is of the essence" provision. The Stantons were obligated to pay Lassonde in installments as the work progressed. Final payment was due "5 days after substantial completion of the work provided the work be then fully completed and the contract fully performed."

The start of construction was delayed until late June because the Stantons did not promptly obtain the financing needed to purchase their log home kit. Thereafter, Lassonde's work "progressed consistently" through the end of December. The home was weather-tight by the third week of September, although prior to that, the lumber was exposed to periods of seasonal rain. The Stantons caused further construction delays during the fall by requesting changes to a special sound system as it was being installed by a subcontractor; the home's interior partitions could not be closed in until the wiring for the sound system was in place. According to Lassonde, the home was ready for occupancy on December 30. The Stantons moved into their home during the second week of January 2006.

In late December, just before moving in, the Stantons sent Lassonde a series of emails with an "aggressive and unpleasant [tone], alleging various acts of misfeasance by the contractors during the course of construction." On January 16, the Stantons also sent a "punch list" of twelve items that, in their view, required further work. Lassonde promptly returned to the

Stantons' property with the intention of addressing those items, but did not complete all of the requested tasks, as he apparently considered some unnecessary or outside the scope of the parties' contract.

After moving in, the Stantons experienced a mold problem in their home that required repair work, including the sanding and refinishing of walls, ceilings and floors. They attributed the mold to excess moisture in the home's logs due to their exposure to rain over the course of the summer. The trial court, however, made these findings:

> [W]hile there is ample evidence that there was moisture accumulation within the house after the Stantons took occupancy, the evidence supports a finding that the accumulation of moisture was directly attributable to the Stantons['] failure to install proper ventilation, compounded by their failure to have dehumidifying equipment in the house. There is undisputed testimony that the Stantons were advised to install a large ventilation fan in the master bathroom but declined to do so. . . . [T]he testimony of the [Stantons'] own expert . . . makes it clear that log cabin structures are known to create unusually high indoor moisture levels during their first several heating seasons because the logs giv[e] up their internal moisture to the interior environment of the house . . . [but] the Stantons refused to install appropriate and reasonable ventilation to the interior.

Moreover, the Stantons had requested that Lassonde install a hot tub and an oversized multiple jet shower in their master bathroom not originally called for in the design plans. The trial court labeled both the shower and the plumbing required to support it as "elaborate." It found that the moisture generated in this bathroom exacerbated "an already potentially humid situation."

After their mold problem surfaced, and the Stantons' relationship with Lassonde began to deteriorate, the Stantons proclaimed their intense dissatisfaction with Lassonde's work to a number of people. They complained about Lassonde's supposed incompetence to various laypeople, subcontractors who frequently worked with Lassonde, at least two potential Mountain View Construction customers, and those present at a meeting of the Pittsburg Board of Selectmen, who were informed by the Stantons that Lassonde had built a "sickly" house. The Stantons even reported to a number of people that their house was so defective it had been condemned, and needed to be torn down. The Stantons did not deny making these statements, but claimed they were truthful and not uttered with malice.

The Stantons also refused to pay Lassonde the final $36,650 due on their contract. They maintained that no balance was due because they had

incurred considerable costs as a result of Lassonde's purported failure to complete their home in a timely and workmanlike manner. In fact, after Lassonde filed suit for breach of contract and defamation, the Stantons counterclaimed for breach of contract.

In its ruling on the parties' competing claims for breach, the trial court credited extensive expert testimony that the Stantons' home was built in a workmanlike manner, while emphasizing the Stantons' own representations to their mortgage company that the home had been completed "per plan specification" and that their contractors would be paid with funds from their final mortgage disbursement. Indeed, the court concluded that there was "no basis in fact" for the Stantons' claims that Lassonde had built their home in a defective manner. It further found that the home was completed within a reasonable time frame, in conformity with the terms of the contract, and that the Stantons caused the construction delays they attributed to Lassonde. The court entered judgment for Lassonde on his claim for breach of contract in the amount of $36,650, plus an additional $6,273 for extra work not called for by the parties' contract, but performed at the Stantons' request. The court also found that Lassonde was entitled to $10,000 in damages for his defamation claim.

## II

In their notice of appeal, the Stantons presented the following issue for our review: "Whether the court's decision in this matter constituted an unsustainable exercise of discretion, as it was against the clear weight of the evidence and the court ignored a significant volume of evidence favorable to the [Stantons]." In their brief, the first question presented asks if "the court err[ed] in holding that the Stanton's [sic] breached their contract with Mountain View and the Lassondes when Mountain View did not comply with its own promises, and the Stanton's [sic] merely withheld payment for that reason[.]" The body of their brief highlights allegedly unkept oral promises from Lassonde to "take care of everything" related to the log home, as an example, and to have the Stantons' home ready by Christmas 2005. The Stantons maintain that given these promises, they "were justified in withholding the final payment." Moreover, they reiterate their argument at trial that it was Lassonde who actually breached the parties' contract.

 Lassonde initially argues that the questions raised by the Stantons in their brief, particularly those relating to any oral promises on the part of Lassonde, were not preserved by their notice of appeal. Appellate questions not presented in a notice of appeal are generally considered waived by this court. *See State v. Jackson*, 144 N.H. 115, 117-18 (1999).

> While the statement of a question need not be worded exactly as it was in the appeal document, the question presented shall be the same as the question previously set forth in the appeal document. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein.

SUP. CT. R. 16(3)(b). Here, we find the issue raised by the Stantons in their notice of appeal fairly encompassed the core question presented by their brief. While the phrasing of their argument was somewhat fluid over time, the Stantons consistently raised a perceived lack of support for the trial court's final ruling that they, and not Lassonde, breached the parties' written contract. We will consequently address the merits of that claim. However, we decline to address whether any oral promises made by Lassonde constituted enforceable modifications of the parties' contract, as is implied by the Stantons' brief, since this question cannot be considered a "subsidiary" issue of any raised in their notice of appeal. *Id.* An evaluation of the existence and enforceability of oral modifications to a contract is an entirely distinct undertaking from an evaluation of whether a trial court's ruling in an action for breach of contract was supported by the evidence. *Compare Guaraldi v. Trans-Lease Group*, 136 N.H. 457, 460-61 (1992), *with Automated Housing Corp. v. First Equity Asso's, Inc.*, 121 N.H. 177, 180 (1981).

We will uphold a trial court's ruling in an action for breach of contract unless the decision was made without evidentiary support or was an unsustainable exercise of discretion. *Automated Housing Corp.*, 121 N.H. at 180; *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). A trial court's findings of fact in a breach of contract action are binding upon us unless they are unsupported by the evidence or erroneous as a matter of law. *Czumak v. N.H. Div. of Developmental Servs.*, 155 N.H. 368, 371 (2007). While the interpretation of a contract is a question of law we would review *de novo, id.* at 373, this appeal does not require interpretation—as opposed to simple application—of the parties' written agreement.

■■ "A breach of contract occurs when there is a failure without legal excuse[] to perform any promise which forms the whole or part of a contract." *Poland v. Twomey*, 156 N.H. 412, 415 (2007) (quotation omitted). In this case, the trial court's ruling that the Stantons breached the parties' contract, and that Lassonde did not, is supported by ample evidence. The Stantons never denied their failure to pay Lassonde the amount due under their contract. They have also failed to show a valid legal excuse for withholding payment. On appeal, the Stantons do not refute the trial court's conclusion that there is "no basis in fact" for their claims that Lassonde

built their house in an unworkmanlike and untimely manner. Specifically, the Stantons have not even attempted to demonstrate that the following findings of the trial court were unsupported by the record: (1) that they did not introduce expert testimony supporting their contention that the logs absorbed excess moisture during construction; (2) that the accumulation of moisture in the Stantons' house was attributable to their own failure to install proper ventilation and utilize dehumidification equipment; (3) that their own modifications to the building plans exacerbated their mold problem; and (4) that, more generally, Lassonde performed on their written contract as required.

Instead, the Stantons assert that Lassonde did not "take care of everything," in the most literal sense. This argument misses the mark; it does not address their role in causing the breaches they attribute to Lassonde, and ignores voluminous evidence that their home was built in a workmanlike manner. Accordingly, we affirm the well-supported ruling of the trial court that the Stantons breached their written contract with Lassonde.

## III

The remainder of the Stantons' arguments on appeal relate to Lassonde's defamation claim. They maintain that: (1) Lassonde was a "limited-purpose public figure," *Thomas v. Telegraph Publ'g Co.*, 155 N.H. 314, 341 (2007), who, accordingly, should have been required to establish actual malice on their part in order to recover damages, *id.* at 340-41; and (2) the court erroneously excluded evidence of newspaper and television publicity regarding Lassonde and his business. They request reversal of the trial court's ruling that Lassonde is a private figure and for us to hold that Lassonde failed to prove actual malice, or, alternatively, for us to remand this case for an inquiry into whether they acted with actual malice.

■■ Whether a defamation plaintiff is a public or private figure is a question of law, which we review *de novo. See id.* at 340. We accord significance to the public or private status of an individual plaintiff in an effort to strike a balance between First Amendment freedoms and state defamation laws. *Id.* "Under the taxonomy developed by the United States Supreme Court, private plaintiffs can succeed in defamation actions on a state-set standard of proof (typically, negligence), whereas the [Federal] Constitution imposes a higher hurdle for public figures and requires them to prove actual malice." *Id.* (quotation and brackets omitted). This distinction flows, in part, from a recognition that public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods, given their assumption of "an influential role in ordering society." *Id.* at 341 (quotation omitted). The United States Supreme Court has established two

subclassifications of public figures: (1) persons who are public figures for all purposes; and (2) so-called limited-purpose public figures. *Id.* at 340; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

The Stantons ask us to consider only whether Lassonde falls into the latter subclassification of public figures. They claim Lassonde is a limited-purpose public figure because he helped construct a home for a disabled man in Maine in conjunction with a reality television program, ABC's "Extreme Makeover: Home Edition," in August 2005. His participation in the show was reported on by at least three newspapers, including the *New Hampshire Union Leader*, the *Berlin Daily Sun,* and the *Colebrook News and Sentinel,* and by Manchester's WMUR television news. The Stantons also point out that Lassonde was mentioned in an August 2005 *Union Leader* article titled "Boom hits NH's upper tip," in which he briefly discussed an increase in demand for second homes in and around Pittsburg. The Stantons claim that these media appearances amounted to a "comment[ary] on matters of public concern," although they fail to reference with any specificity what matter of public concern was implicated.

■ "[I]ndividuals may become limited-purpose public figures when they have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Thomas*, 155 N.H. at 341 (quotation omitted). "Then, they become [] public figure[s] for a limited range of issues." *Id.* (quotation and brackets omitted). "Courts make the limited-purpose public figure determination by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* (quotation omitted).

■ "As the first step in [the limited-purpose public figure] inquiry, the court must isolate the public controversy" in question. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir.), *cert. denied,* 449 U.S. 898 (1980); *see Thomas*, 155 N.H. at 341; *Hatfill v. New York Times Co.*, 532 F.3d 312, 322 (4th Cir. 2008); *Copp v. Paxton*, 52 Cal. Rptr. 2d 831, 844 (Ct. App. 1996). "Identification of the implicated public controversy is not a mere formality," *Norris v. Bangor Pub. Co.*, 53 F. Supp. 2d 495, 503 (D. Me. 1999), because the scope of the controversy in which the plaintiff involves himself defines the bounds of his public presence, *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 42-43 (D.D.C. 2005).

■ "A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum*, 627 F.2d at 1296; *see Norris*, 53 F. Supp. 2d at 503 (the implications of a public controversy will affect the public and not merely the litigants).

 The [United States] Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

*Waldbaum*, 627 F.2d at 1296 (citation omitted); *cf. Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976) (divorce of extremely wealthy individuals not a public controversy despite interest of some portion of public in such marital difficulties); *Hatfill*, 532 F.3d at 323-24 (threat from bioterrorism and the nation's readiness to handle that threat a public controversy); *Tavoulareas v. Piro*, 817 F.2d 762, 773-74 (D.C. Cir.) (public controversy existed concerning manner in which United States oil industry responded to the rise of OPEC and energy crisis of 1970s), *cert. denied*, 484 U.S. 870 (1987); *Thomas*, 155 N.H. at 342 (string of burglaries, even of a large number of homes, not a public controversy; only those whose homes had been burgled truly affected). "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." *Waldbaum*, 627 F.2d at 1297.

Here, the controversy that gave rise to the Stantons' defamatory remarks is whether or not Lassonde performed on the parties' contract by building the Stantons' home in a workmanlike manner. Thus, when asking us to label Lassonde a limited-purpose public figure, the Stantons necessarily argue that this controversy had taken on such significance that its resolution would affect at least a portion of the general public. We do not agree. The Stantons do not posit, and we cannot conceive, how the effects of their dispute with Lassonde would be felt by a segment of society at large in any appreciable way. Even if the Stantons had shown that Lassonde built a defective house, this would not have affected any person who is not a party to this lawsuit. The Stantons would have revealed nothing more than a single instance of substandard construction by a contractor tasked with building a single-family residence.

 As a result, we conclude that this matter does not present a public controversy; for the purposes of a defamation claim, this is a purely private dispute. In the context of this case, it was therefore not possible for Lassonde to have "thrust [himself] to the forefront of [a] particular public controvers[y]," *Thomas*, 155 N.H. at 341, and the Stantons' argument that he was a limited-purpose public figure consequently fails from the start. Moreover, we note that the Stantons have failed to even claim that Lassonde's media appearances related to the controversy in question here. In other words, they have also failed to show that Lassonde turned to the

media "in order to influence the resolution of the issues involved." *Id.*; *cf. Hatfill*, 532 F.3d at 322 ("[W]e first address the nature of the 'particular public controversy' that gave rise to the alleged defamation to determine whether [the plaintiff] thrust himself into *that* controversy.").

Accordingly, we affirm the trial court's ruling that Lassonde was entitled to damages on his defamation claim without showing actual malice on the part of the Stantons. He cannot be properly classified as a limited-purpose public figure. Given our holding that the Stantons' argument to that effect failed *ab initio*, we also disagree with their secondary claim that the trial court erred by excluding evidence that Lassonde was a public figure. This evidence was irrelevant. *See* N.H. R. Ev. 401.

## IV

In his cross-appeal, Lassonde asks us to vacate the trial court's award of $10,000 on his defamation claim. He maintains that the evidence at trial compelled an award of $30,000. We disagree.

"[Q]uestions of whether plaintiff has, in fact, sustained an injury or any damage, and, if he has, the nature and extent thereof, are questions of fact for determination by the . . . trier of facts." *Thomson v. Cash*, 119 N.H. 371, 376 (1979) (brackets and ellipsis omitted). Again, we will not disturb the factual findings of the trial court unless they are unsupported by the record. *See Czumak*, 155 N.H. at 371.

Lassonde's contention that the record supported an award of $30,000 is based upon the claimed profit he would have earned on a contract with Ron Belida. Belida was a potential Mountain View Construction customer who emailed Lassonde in November 2006 with a query about the Stantons' home having been condemned—information he presumably could only have received from the Stantons. We note that at trial, however, Lynn Lassonde, Mr. Lassonde's wife and business partner, merely speculated that Mountain View Construction had definitely lost Belida's business as a result of the Stantons' statements. In fact, when she was asked by the trial judge to definitively state whether that particular sale had been lost, she replied, "I'm still working on it." She acknowledged that she had only been "hoping for a deposit" from Belida and that she had "been working to get [her relationship with Belida] back." The Lassondes introduced no other concrete evidence of a lost business opportunity flowing from the Stantons' defamatory remarks.

This does not mean the trial court erred by awarding Lassonde $10,000, however, as is argued by the Stantons. "When as in this case, the [fact finder] could find that the defamatory publication charged the

plaintiff . . . with activities which would tend to injure him in his trade or business, commonly called libel *per se*, he can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation." *Chagnon v. Union-Leader Co.*, 103 N.H. 426, 441 (1961), *cert. denied*, 369 U.S. 830 (1962). "He need not prove these damages specifically." *Id.*; *see* RESTATEMENT (SECOND) OF TORTS § 573 (1977) ("One who publishes a slander that ascribes to another conduct . . . that would adversely affect his fitness for the proper conduct of his lawful business . . . is subject to liability without proof of special harm.").

Here, the trial court correctly found that Lassonde had proven defamation *per se. See Chagnon*, 103 N.H. at 441. Its order then stated:

> The plaintiff is entitled to recover general damages and no proof of special damages is required. The plaintiff is entitled to recover all damages that would normally result from such defamation, such as harm to reputation.
>
> In awarding general damages the Court is mindful of the geographic location in which Lassonde works. Pittsburg, New Hampshire is a small business market and the defendants[] [made a] purposeful and willful attempt to interfere with Lassonde's business opportunities. Accordingly, the Court finds and rules that the plaintiff is entitled to damages for defamation *per se* and award[s] him damages in the amount of $10,000.

We decline to address the Stantons' bald contention, made without adequate appellate argument, that these factual findings on general harm are not supported by the record. *See Franklin Lodge of Elks v. Marcoux*, 149 N.H. 581, 592 (2003). Seeing no legal error, we affirm the trial court's award.

## V

We next address Lassonde's argument that the trial court erred by denying his request to include pre-judgment interest at a rate higher than that provided by statute as a component of his breach of contract award. *See* RSA 336:1 (Supp. 2007); *see also* RSA 524:1-a (2007) (interest awarded from commencement of action on a debt in the absence of prior demand). He maintains that the Stantons were obligated to pay such interest under the terms of the parties' contract. Their contract states: "Final payment is due at the completion of the project. Final payment not made as agreed may result in an additional finance charge of 15%-18% per annum added to the outstanding balance." The trial court found this clause ambiguous, stating that it was unable to determine "what the actual interest rate to be charged should be," and declined to enforce it.

■ The interpretation of a contract is a question of law that we review *de novo. Czumak,* 155 N.H. at 373. "When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and context in which the agreement was negotiated, when reading the document as a whole." *Gen. Linen Servs. v. Franconia Inv. Assocs.,* 150 N.H. 595, 597 (2004). "Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used." *Id.* Ambiguity exists only when the parties could reasonably disagree as to a clause's meaning. *See id.*

■ We disagree with the trial court that the contract clause at issue here is ambiguous. To be sure, it does not set forth an absolutely certain consequence—the finance charge "may" be assessed, and a range of interest rates is articulated. This lack of precision does not create "ambiguity," however, as that term is used in the context of contract interpretation. The Stantons propose no alternative meaning, *cf. id.,* for a clause which plainly states that they may be charged, at Lassonde's discretion, interest in the range of "15%-18% per annum" on any outstanding balance owed to him. Indeed, we can conceive of no other reasonable meaning for the disputed clause, and therefore find it unambiguous.

Accordingly, we agree with Lassonde that he was entitled to insist that the Stantons pay pre-judgment interest at a rate of "at least" fifteen percent. Because the Stantons agreed to such a charge in writing, it is enforceable. *Albee v. Wolfeboro Railroad Co.,* 126 N.H. 176, 180 (1985); *see* RSA 336:1. We vacate that portion of the trial court's order stating that Lassonde was only entitled to an interest assessment at the statutory rate, and remand for a recalculation of his award. Since Lassonde makes no demand for the imposition of an interest rate higher than fifteen percent, that shall be the figure employed on remand.

## VI

Lassonde also argues, again based upon the terms of the parties' contract, that the trial court erred by not awarding him attorney's fees. He relies upon the following contractual provision: "Contractor reserves the right to file a mechanical [*sic*] lien or a lien certificate with the registry of deeds for any portion of the unpaid balance plus collection costs, interest and attorney's fees."

In this instance, we agree with the trial court's ruling that the contract language Lassonde relies upon is ambiguous. *See Gen. Linen Servs.,* 150 N.H. at 597. The parties attach different reasonable meanings to the clause: while Lassonde argues that this provision entitled him to an award commensurate with fees paid for his entire collection action, the Stantons, as stated in their objection to the imposition of fees filed with the trial court,

maintain that "[t]he provision . . . affords the contractor the costs, interests, and fees *only* for enforcing a mechanic's lien." We note that in their reply brief the Stantons further offer that the clause could be read to mean that Lassonde "can file for collections [*sic*] costs, regardless of whether there is also a filing for a lien, and may also file for interest and attorney's fees."

Despite the Stantons' concession that the contract contemplates some sort of a fee award to Lassonde, the trial court made the following order:

> The language relied upon by the plaintiff is not specific or clear. The contract language generally permitting awarding of attorney's fees and costs includes words such as reasonable attorney's fees and costs incurred for collection. The language relied upon by the plaintiff neither defines the nature of the attorney's fees nor the context in which they will be awarded.
>
> The Court finds and rules that the contract language is ambiguous with respect to the collection of attorney's fees and accordingly, the Motion for Clarification, as it relates to attorney's fees is DENIED.

In short, the trial court effectively ruled that the disputed clause did not entitle Lassonde to *any* type of fee award.

■■■■■ This ruling was erroneous; the contract clause in question cannot be interpreted, as a matter of law, to deny Lassonde fees altogether if the Stantons defaulted on their contractual duty to pay. We find, instead, that the contract clearly contemplates an award of some attorney's fees, although we agree with the trial court that the exact nature of the proper fee award (*i.e.*, fees for the mere filing of a mechanic's lien, or fees for Lassonde's entire collection action) requires clarification. Accordingly, we vacate that portion of the trial court's order denying Lassonde attorney's fees altogether, and remand for further proceedings to discern the intent of the parties when adding the fee clause to their contract. *See Gen. Linen Servs.*, 150 N.H. at 597 (if contractual language found to be ambiguous, "it must be determined what the parties, under an objective standard, mutually understood the ambiguous language to mean"); *MacLeod v. Chalet Susse Int'l Inc.*, 119 N.H. 238, 243 (1979) ("If . . . the court determines that ambiguities are present, it must . . . resolve those ambiguities.").

## VII

Finally, Lassonde argues that the trial court erred by failing to award him attorney's fees under the rule of *Harkeem v. Adams*, 117 N.H. 687, 690-91 (1977) (litigation conducted in "bad faith" may justify award of

counsel fees). We agree with the Stantons, however, that Lassonde failed to preserve this issue for our review, because he failed to raise it before the trial court. *See Dent v. Exeter Hosp.*, 155 N.H. 787, 794 (2007). As the appellant on this particular question, Lassonde bore the burden of demonstrating that he requested an award under *Harkeem* below. *See id.*; SUP. CT. R. 16(3)(b). Our review of Lassonde's post-trial motion for clarification regarding an award of fees, as well as the remainder of the record, reveals that he failed to do so. In fact, we observe that Lassonde's perceived "entitlement" to fees, as stated in his motion, "[would] not [have been] a discretionary function of the Court stemming from any claim of bad faith." Accordingly, we decline to address this issue.

*Affirmed in part; vacated in part; and remanded.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.