Hillsborough-northern judicial district
No. 2009-180

IN THE MATTER OF PAMELA TABER-MCCARTHY AND RICKY C. MCCARTHY

Argued: February 18, 2010
Opinion Issued: April 9, 2010

*Mosca Law Office*, of Manchester (*Edward C. Mosca* on the brief and orally), for the petitioner.

*Walker & Buchholz, P.A.*, of Manchester (*Kevin E. Buchholz* on the brief and orally), for the respondent.

DALIANIS, J. The respondent, Ricky C. McCarthy, appeals an order recommended by a Marital Master (*Green*, M.) and approved by the Superior Court (*Abramson*, J.) that adopted the qualified domestic relations order (QDRO) proposed by the petitioner, Pamela Taber-McCarthy. We affirm.

The record reveals the following facts. The parties married in 1998. On January 16, 2006, the petitioner filed for divorce. Their final divorce decree, entered in April 2007, provided, in pertinent part:

C. Retirement. The parties agreed on the amount of the retirement and the effective date all parties utilized for figuring the same. If it turns out that as of 1/16/06 the figure[] presented relative to Respondent's retirement plan of $105,070.65 is not accurate, the amount to be transferred can be adjusted either up or down reflecting the accurate figure.

The Petitioner agreed that her counsel will prepare the QDRO needed to transfer funds from the Respondent to the Petitioner. The counsel for the Petitioner shall have the right to contact the Respondent's employer . . . and obtain the appropriate information, valuation and forms that are necessary to effectuate an appropriate QDRO. The Respondent shall execute all documents necessary to allow Petitioner's counsel to have access to this information. . . . If the Court finds that there is any delay in signing authorizations to obtain information, a motion for contempt and appropriate sanctions will be entertained by the court.

The parties' divorce decree became effective July 13, 2007. In August 2007, the parties stipulated to a QDRO. The stipulated QDRO gave the date of marriage as September 26, 1998; the date of filing of the divorce petition as January 16, 2006; and the date of the divorce as July 13, 2007. The stipulated QDRO assigned to the petitioner "an amount equal to 50% of the [respondent's] 'vested benefit' under [his employer's 401(k) plan] which was earned *during the period of the marriage only* from September 26, 1998 to January 16, 2006." "This amount," the stipulated QDRO provided, "is calculated to be $77,430. One half of this amount is $38,715. This amount shall be reduced by . . . $4,735.04 . . . . [Accordingly,] [t]he net amount due [the petitioner] is $33,979.96."

The stipulated QDRO further provided: "In the event the Plan Administrator determines that this order is not a [QDRO] . . . , both parties shall cooperate with the Plan Administrator to make the changes necessary for it to become a qualified order. This includes signing all documents which may be necessary for the parties to obtain an amended order that meets the requirements for a [QDRO] . . . ."

The stipulated QDRO was never entered as a court order, however, because the administrator of the respondent's retirement plan expressed concerns about it, which the parties were unable to resolve. Specifically, the plan administrator noted that the stipulated QDRO was "unclear [as] to whether or not gains (losses) should be applied from January 16, 2006 until the date of distribution or transfer or if the $33,979.96 is a lump sum payment." The parties attempted to negotiate an addendum to the stipulated QDRO that would address this concern, but were unable to agree.

In December 2008, following numerous hearings on the issue, the court adopted the petitioner's proposed QDRO, which provided, in pertinent part, that the net amount due her ($33,979.96) "shall be a lump sum amount payable without any gains or losses thereon."

On appeal, the respondent argues that the QDRO the court ultimately adopted caused him to suffer the "loss of approximately $12,000 . . . out of his portion of the funds in order to pay the petitioner the original amount agreed to, which in effect awarded [her] more than what the parties' agreement called for [her] to receive." He contends that the QDRO, therefore, effected an unequal division of property and that the trial court could not have reasonably found any special circumstances to warrant such a division. He further contends that the division of property, as effected by the QDRO, is inequitable, particularly given the petitioner's delay in getting the stipulated QDRO approved. He argues that given the delay caused by the petitioner, the trial court unsustainably exercised its discretion by failing to award her the original amount agreed to less the losses incurred in the interim. He also asserts that the trial court improperly applied the *Hodgins* formula. *See Hodgins v. Hodgins*, 126 N.H. 711, 716 (1985), *superseded by statute on other grounds by* RSA 458:16-a, I (2004). Finally, he argues that the trial court erred when it failed to grant his motion to compel. We address each of his arguments in turn.

■ We first address whether the QDRO the court ultimately ordered awarded the petitioner more than the parties' agreement called for her to receive. A stipulated agreement is contractual in nature and, therefore, is governed by contract rules. *Czumak v. N.H. Div. of Developmental Servs.*, 155 N.H. 368, 373 (2007). The interpretation of a contract is a question of law, which we review *de novo. Id.* When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. *Id.* Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract. *Id.*

■ "The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." *N.A.P.P. Realty Trust v. CC Enterprises*, 147 N.H. 137, 139 (2001) (quotation and brackets omitted). "If the agreement's language is ambiguous, it must be determined, under an objective standard, what the parties, as reasonable people, mutually understood the ambiguous language to mean." *Behrens v. S.P. Constr. Co.*, 153 N.H. 498, 503 (2006). In applying the objective standard, a court should examine the contract as a whole, the circumstances·surrounding execution and the object intended by the agreement,

while keeping in mind the goal of giving effect to the intention of the parties. *N.A.P.P. Realty Trust*, 147 N.H. at 141.

According to the parties' final divorce decree, "[t]he parties agreed on the amount of the retirement and the effective date" for valuing the parties' retirement benefits. The parties agreed that the valuation date was January 16, 2006. As of that date, the respondent's retirement plan was valued at $105,070.65, however, the parties' decree stated that "[i]f it turns out that . . . [this figure] . . . is not accurate, the amount to be transferred can be adjusted either up or down reflecting the accurate figure."

Thereafter, the parties entered into a stipulated QDRO. Consistent with the parties' agreement, as reflected in their divorce decree, the stipulated QDRO valued the parties' retirement benefits as of January 16, 2006. The stipulated QDRO stated that "[t]he net amount due [the petitioner] is $33,979.96" based upon the values of the parties' retirement benefits as of the agreed-upon valuation date.

The plain meaning of the stipulated QDRO was that the petitioner was to receive a net amount equal to $33,979.96. As the respondent concedes: "Nothing in the QDRO called for the application of any gains and losses on [the petitioner's] distribution from the date of calculation to the date of segregation or distribution." The QDRO is not ambiguous in this respect, however. *See Dow Associates, Inc. v. Gulf Oil Corp.*, 114 N.H. 381, 383 (1974). It is simply *silent* on this issue. *See id.*

We first articulated this principle in *Dow*, which concerned the interpretation of a lease. In that case, a dispute between the parties arose regarding whether the tenant or landlord was responsible for the cost of sewer rental. *Id.* at 382-83. The parties' lease, "while detailed in many respects, did not state which party was responsible for payment of water, sewer, and electricity bills." *Id.* at 383 (quotation omitted). We held that because the agreement was silent upon this issue, the trial court properly ruled that the tenant's refusal to pay the sewer rental did not breach the lease. *Id.* The trial court could not "supply the deficiency by writing into the lease a provision for the payment of sewer rental, when the parties did not." *Id.* The agreement was not ambiguous with regard to who was responsible for paying the sewer rental; it was silent. *Id.*

Although *Dow* arose in a different context, we find its reasoning to be applicable here. In this case, while the parties' stipulation regarding the QDRO was detailed in many respects, "[w]hether by accident or design," the parties failed to state in their agreement that the amount the petitioner was to receive under the QDRO included gains and/or losses. *Id.* The stipulated QDRO was "not ambiguous in this respect; it [was] simply silent." *Id.* Thus, the trial court did not err by applying the plain language

of the stipulation awarding the petitioner $33,979.96. *See id.* Contrary to the respondent's assertions, the trial court's order awarded the petitioner precisely what the parties' agreement called for her to receive.

We next turn to the respondent's assertions that the trial court's order impermissibly effected an unequal division of property. The respondent argues that in the nearly three years since the divorce became final, changes in the stock market have effectively made the $33,979.96 a larger portion of his retirement. Thus, he claims that what was fair and equitable in 2007 is no longer so and that "to reach an equitable result," the trial court should have awarded the petitioner less than the amount stipulated in the QDRO.

██ "A property settlement in a divorce decree is a final distribution of a sum of money or a specific portion of the spouses' property and is not subject to judicial modification on account of changed circumstances." *In the Matter of Birmingham & Birmingham*, 154 N.H. 51, 57 (2006) (quotation omitted). "Such a property distribution will not be modified unless the complaining party shows that the distribution is invalid due to fraud, undue influence, deceit, misrepresentation, or mutual mistake." *Id.* (quotation and brackets omitted). The respondent has neither argued nor demonstrated that modification of the parties' property settlement was required for any of the foregoing reasons. *See id.* Accordingly, he has failed to demonstrate that modification of the parties' property settlement was necessary. *See id.* The respondent's reliance upon changed circumstances, such as the decline of the stock market, is insufficient to warrant modifications to the original property division. *See id.*

██ We next address whether, as the respondent claims, the trial court misapplied the *Hodgins* formula. In *Hodgins*, we established a formula for equitably apportioning retirement benefits when the actual and contingent values are unascertainable. *See In the Matter of Watterworth & Watterworth*, 149 N.H. at 452. The *Hodgins* formula calculates a percentage to be paid to an employee's former spouse by dividing the number of months the employee was employed during the marriage and before divorce commenced by the total number of credits the employee will have earned toward the retirement benefit as of the date benefits commence and awarding half of this amount to each spouse. *Id.*; *see Hodgins*, 126 N.H. at 716. The *Hodgins* formula is designed to help trial courts avoid the problem of valuation when it is impossible to determine the value of the retirement benefit at the time of divorce. *In the Matter of Watterworth & Watterworth*, 149 N.H. at 452. The formula does not apply when the value of the retirement benefit is ascertainable. *See id.*

█ Although the trial court's order referred to the *Hodgins* formula, the record demonstrates that, in fact, the court did not apply this formula to divide the respondent's retirement account. Nor was it required to do so. *See id.* The respondent's retirement benefit, a 401(k) account, was a defined contribution plan. As such, it had an ascertainable value. *See id.* Therefore, the trial court did not, and had no need to, resort to the *Hodgins* formula to ascertain the actual value of the respondent's retirement benefit as of the valuation date. *See id.*

█ Finally, we address whether the trial court erred when it failed to grant the respondent's motion to compel. The respondent's motion sought to compel the petitioner to sign a form allowing him access to information about her retirement accounts. He argues that the trial court should have granted his motion because the court allowed the petitioner to seek information pertaining to the gains/losses to his retirement benefit. Since the petitioner never actually obtained the information she sought, and since the parties never disputed the amount of the petitioner's own retirement benefit, we hold that the trial court committed no reversible error by failing to grant his motion.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.