**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-1167

SADIA, S.A.,

Appellant

v.

HUBBARD FARMS, LLC;
MERIAL, LLC;
HUBBARD, LLC;
HUBBARD FARMS, INC.

(Amended per Clerk's Order dated 2/17/09)

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 3-06-cv-03831
District Judge: The Honorable Freda L. Wolfson

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 21, 2010

Before: SMITH, FISHER, and COWEN, *Circuit Judges*

(Filed: July 15, 2010)

OPINION

1

SMITH, *Circuit Judge*.

This is a case about sick chickens.  Granja Rezende, S.A. ("Granja") was a Brazilian company that sold parent chickens bred from grandparent chickens purchased from Hubbard Farms, Inc.[1]  In 1978, Granja and Hubbard entered into an agreement whereby Granja would purchase grandparent chickens from Hubbard.  Approximately 18 years later, in 1996, Hubbard shipped grandparent chickens to Granja that were infected with Avian Leukosis Virus and the disease spread through Granja's chickens.  The spread of the disease did not just harm Granja's chicken stock.  Several of Granja's customers filed suit against Granja for damages stemming from their purchases of sick parent chickens.  In August 2002, Sadia, S.A. ("Sadia"), the plaintiff in the instant action, acquired Granja and it now seeks indemnification and contribution from Hubbard for damages arising out of the suits filed against Granja and Sadia by Granja's customers.

The District Court entered summary judgment in favor of Hubbard, concluding that Granja had settled any claims against Hubbard stemming from the sick chickens shipped in the mid-1990s.  It reached this conclusion by looking to two agreements Granja and Hubbard entered into in 1998.  Sadia now appeals.  We will affirm the District Court's entry of summary judgment in favor of Hubbard, but we do so based on the agreement that Granja and Hubbard entered into in 1978, not the later 1998 agreements.

---

[1]  The complaint names Hubbard Farms, Inc., Merial LLC, Hubbard Farms LLC, and Hubbard LLC as defendants.  We will refer to all the defendants collectively as "Hubbard."

I.

Sadia is a Brazilian company that merged with Granja on August 30, 2002. It is the successor-in-interest to Granja. At all times relevant to this appeal, the defendants were Delaware companies doing business in New Jersey. On January 1, 1978, Granja and Hubbard entered into a chicken breeding agreement (the "1978 Agreement"). Under that agreement, Granja became Hubbard's exclusive distributor for Brazil and Uruguay. Hubbard provided grandparent chickens to Granja, and Granja then bred those chickens and sold the offspring—parent chickens—to its customers. The 1978 Agreement had a choice-of-law provision stating that the agreement was "governed by the substantive law of the State of New Hampshire." It also contained a hold-harmless clause, in which Granja agreed to "hold [Hubbard] harmless from any and all claims against it arising from the conduct of [Granja]." At some point in the 1990s, Hubbard's grandparent chickens became infected with Avian Leukosis Virus, a contagious illness that causes a variety of health problems in chickens. Some of Hubbard's sick chickens were shipped to Granja pursuant to the 1978 Agreement and those sick chickens infected Granja's chickens.

In 1998, Granja and Hubbard entered into two agreements pertaining to the sick chickens. The first agreement was formed on March 5, 1998 (the "March 1998 Agreement"). In the March 1998 Agreement, Hubbard agreed that the grandparent chickens it supplied to Granja between June 1996 and October 1997 were one of the sources of the virus which infected Granja's chickens. Hubbard agreed to reimburse

3

Granja the invoice value of the infected grandparent chickens. The March 1998 Agreement stated that it "settle[d] all claims related to [the virus] for flocks supplied up to [March 5, 1998]."

The second agreement was entered into in November 1998 (the "November 1998 Agreement"). The November 1998 Agreement, *inter alia*, gave Granja six additional months to pay outstanding invoices. In addition, Hubbard agreed to pay $472,213 to Granja. Granja and Hubbard agreed that there would be "no additional penalties or damages to either party against the other resulting from this agreement or relating to any stock supplied by Hubbard up to the date of the Agreement."

On May 11, 2007, Sadia filed an amended complaint in the United States District Court for the District of New Jersey, seeking contribution and indemnification from Hubbard for suits filed against Granja and Sadia in connection with Hubbard's sick chickens. According to Sadia, Hubbard's sick chickens resulted in three suits: (1) a suit filed against Granja that was settled for approximately $375,000 on June 5, 2005, (2) a suit filed against Granja for which a judgment of approximately $3,210,000 was entered against Sadia as Granja's successor-in-interest on May 5, 2006, and (3) a suit filed against Sadia, seeking approximately $21,500,000 for damages arising from Granja's sale of sick chickens. The third suit was still pending as of the date of the District Court's decision. Sadia also sought a declaratory judgment stating that its rights to indemnification and contribution from Hubbard applied to all pending and future claims brought against it

arising from the sick chickens Hubbard supplied to Granja.

On July 20, 2007, Hubbard sought dismissal of Sadia's suit under Rule 12(b)(6) or, in the alternative, under Rule 56. On December 22, 2008, the District Court entered summary judgment in favor of Hubbard. In doing so, it concluded that the hold-harmless clause of the 1978 Agreement was ambiguous, and that the March and November 1998 Agreements settled any potential claim against Hubbard. Thus, Sadia could not seek contribution or indemnification from Hubbard based on Hubbard's sale of sick chickens to Granja. Sadia filed this timely appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. "We review an order granting summary judgment de novo, . . . evaluat[ing] the evidence in the light most favorable to the nonmoving party." *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3d Cir. 1999). Summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "We may affirm the District Court on any grounds supported by the record." *Nicini v. Morra,* 212 F.3d 798, 805 (3d Cir. 2000) (en banc).

Sadia insists that the March and November 1998 Agreements were not general releases of claims for contribution and indemnification against Hubbard. Even if that

were true, however, Sadia cannot succeed in this appeal because the 1978 Agreement

unambiguously released Hubbard from claims for contribution and indemnification. The

hold-harmless clause in the 1978 Agreement states:

> [Granja] shall hold [Hubbard] harmless from any and all claims
> against it arising from the conduct of [Granja]. As between
> [Hubbard] and [Granja], [Granja] shall take full responsibility
> for any and all claims for adjustments or replacements or
> otherwise arising (i) from [Granja]'s sales of parent stock
> produced from matings of grandparent stock supplied by
> [Hubbard] hereunder and (ii) in connection with any progeny of
> said stock.

In interpreting this clause, the District Court implicitly concluded that Granja's "conduct"

need have been somehow wrongful to trigger the clause. In the District Court's view, the

claims against Granja arose from Hubbard's "conduct"—its sales of sick chickens to

Granja. Granja's "conduct," on the other hand, was blameless: it simply unwittingly sold

infected parent chickens to its customers. Based on this understanding of the term

"conduct," the District Court reasoned that there were ambiguities in the hold-harmless

clause, namely that the second sentence could be read as (1) explaining when Hubbard

can invoke the hold-harmless clause when a suit names it as a defendant and Granja's

conduct caused the harm, or (2) describing additional circumstances where Hubbard can

invoke the hold-harmless clause even if Granja's conduct was not the source of the harm.

We disagree with the District Court's interpretation of the term "conduct" and, as a

result, reject its conclusion that the hold-harmless clause was ambiguous. Under New

Hampshire law, "[w]hen interpreting a written agreement, we give the language used by

6

the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." *In the matter of Taber-McCarthy & McCarthy*, 993 A.2d 240, 244 (N.H. 2010); *Murphy v. Doll-Mar, Inc.*, 419 A.2d 1106, 1108 (N.H. 1980) ("In reaching the proper interpretation we require that the words and phrases used by the parties be given their common meaning, . . . and this court will determine the meaning of the contract based upon the meaning that would be attached to it by a reasonable person."). "The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." *In the matter of Taber-McCarthy & McCarthy*, 993 A.2d at 244.

The first sentence of the hold-harmless clause forecloses any claim against Hubbard for contribution or indemnification: "[Granja] shall hold [Hubbard] harmless from any and all claims against it arising from the conduct of [Granja]." To determine the scope of this release, we must determine what constitutes the "conduct" of Granja. To do so, we use the "common meaning" of the term. *Murphy*, 419 A.2d at 1108. The word "conduct" means "the act, manner, or process of carrying on." *Merriam-Webster's Collegiate Dictionary* 259 (11th ed. 2003). Under this definition, Granja's sales of parent chickens to its customers that resulted in suits against it were "conduct" because they were "act[s]" carried out by Granja. *Id.* Nowhere in the hold-harmless clause does it state that the "conduct" by Granja must have been somehow wrongful—*any* conduct by Granja from which a claim arises is sufficient for Hubbard to invoke the hold-harmless

7

clause. The claims for which Sadia seeks contribution and indemnification arose from Granja's sales of parent chickens. Accordingly, the hold-harmless clause protects Hubbard from liability. Although this result may appear unfair to Sadia, we are bound to enforce the contract as written. *Mills v. Nashua Fed. Sav. & Loan Ass'n*, 433 A.2d 1312, 1315 (N.H. 1981) ("Parties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably."); *Hobin v. Coldwell Banker Residential Affiliates, Inc.*, 744 A.2d 1134, 1139 (N.H. 2000). The second sentence of the hold-harmless clause also forecloses any claim against Hubbard for contribution or indemnification. The claims for which Sadia seeks contribution and indemnification arose "from [Granja's] sales of parent stock produced from matings of grandparent stock supplied by [Hubbard.]" Thus, the claims fall squarely under the second sentence of the hold-harmless clause and Granja was assigned full responsibility for those claims.[2] We will affirm the District Court's order granting

---

[2] The 1998 Agreements do not change our analysis. The 1978 Agreement stated that it "may be amended only by a written instrument executed by both parties stating that it is an amendment[.]" The March 1998 Agreement does not even mention the 1978 Agreement, let alone explicitly amend it. The November 1998 Agreement, on the other hand, actually bolsters our conclusion by re-asserting the continued validity of the hold-harmless clause. That contract included a provision stating that Granja and Hubbard agreed that they would terminate the 1978 Agreement by formal letter by the end of November 1998. The formal letter terminating the 1978 Agreement, dated November 17, 1998, explained that the 1978 Agreement would remain in place until December 31, 1999, at which point it would be terminated. The formal letter also explained that, except for a few suspensions and modifications that are irrelevant to this appeal, "all [the] terms

8

summary judgment in favor of Hubbard.[3]

---

and conditions of the [1978] Agreement [would] remain unchanged and binding on the parties [until the termination date]." In other words, the November 1998 Agreement explicitly recognized the continued effect of the hold-harmless clause.

[3] Because we are affirming the order granting summary judgment in favor of Hubbard, we need not address Sadia's argument that the District Court erred by dismissing Hubbard LLC from the action.