Rockingham
No. 2011-057

### HANSA CONSULT OF NORTH AMERICA, LLC

v.

### HANSACONSULT INGENIEURGESELLSCHAFT MBH

Argued: October 19, 2011
Opinion Issued: December 15, 2011

*Pierce Atwood LLP*, of Portsmouth (*Lawrence M. Edelman* and *Michele E. Kenney* on the brief, and *Mr. Edelman* orally), for the plaintiff.

*Orr & Reno, P.A.*, of Concord (*Lisa Snow Wade* and *John L. Arnold* on the brief, and *Ms. Wade* orally), for the defendant.

LYNN, J. The plaintiff, Hansa Consult of North America, LLC (HCNA), appeals an order of the Superior Court (*McHugh*, J.) granting the motion to dismiss of the defendant, hansaconsult Ingenieurgesellschaft mbH (hansaconsult). We affirm in part, reverse in part, and remand.

I

HCNA, an American company based in Portsmouth, and hansaconsult, a German company, are both involved in the business of detecting fuel leaks at airports. The two companies began their relationship on cooperative terms, having entered into a distribution agreement in 2001 that made HCNA the exclusive distributor of hansaconsult's products and services throughout the United States and Canada. That relationship broke down, however, and the parties terminated their agreement on December 31, 2005.

In 2006, hansaconsult commenced litigation against HCNA in New Hampshire and Germany. The New Hampshire action, filed in March 2006, alleged that HCNA violated various New Hampshire statutes and committed various common-law torts. HCNA asserted several similar counterclaims in its answer. The German action, filed in June 2006, alleged that HCNA had violated the terms of the distribution agreement, whose forum selection clause specified that "Place of Jurisdiction is only Hamburg." In August 2006, however, the parties entered into a settlement protocol agreement (SPA), which included a provision dismissing both the German and New Hampshire actions without prejudice to pending settlement negotiations.

After years of fruitless settlement efforts, in January 2009 hansaconsult again sued HCNA for breaching the 2001 distribution agreement, but this time only in Germany. Believing this lawsuit to violate the SPA, HCNA moved in superior court, in June 2009, to enjoin hansaconsult's German lawsuit and to enforce the SPA. Before the superior court responded to that motion, apparently out of concerns that the statute of limitations would run on its claims, HCNA filed its own lawsuit against hansaconsult in New Hampshire on December 11, 2009, asserting the same claims it had brought as counterclaims in hansaconsult's original March 2006 New Hampshire action against HCNA. Hansaconsult moved to dismiss that action, and both parties agreed to stay resolution of hansaconsult's motion to dismiss pending the trial court's decision on HCNA's June 2009 motion to enforce

the SPA. On April 7, 2010, the superior court issued a preliminary ruling on the motion to enforce the SPA, concluding that its only task was to determine whether hansaconsult had violated the SPA's good faith requirement, scheduling a hearing to decide that limited issue, and stating that all of the parties' underlying claims should be litigated in Germany because they all arise under the distribution agreement. After the good faith hearing, the court issued a final order on September 28, 2010, deciding that neither party had breached its obligations under the SPA, concluding that a settlement was unlikely, and again stating that the 2001 distribution agreement required all claims between the parties to be heard in Germany. HCNA moved to reconsider, arguing that the SPA should still be enforced, and that the court incorrectly concluded that all of its underlying claims should be litigated in Germany pursuant to the terms of the 2001 distribution agreement. The court denied that motion, and we affirmed that decision by order without addressing the issue of whether HCNA's claims against hansaconsult should be heard in Germany. *Hansaconsult Ingenieurgesellschaft mbH v. Hansa Consult of North America, LLC & a.*, No. 2010-0803 (N.H. Aug. 24, 2011).

On October 28, 2010, having denied HCNA's motion to enforce the SPA, the trial court granted hansaconsult's motion to dismiss HCNA's 2009 lawsuit. HCNA moved to reconsider, arguing: (1) that the motion to dismiss had been withdrawn and thus was not yet ready for adjudication; (2) that, as a result, granting the motion to dismiss deprived HCNA of notice and an opportunity to be heard; and (3) that its 2009 claims against hansaconsult do not arise under the distribution agreement and may therefore be litigated in New Hampshire. The trial court denied HCNA's motion because "the plaintiff cannot separate this case from the provisions of the Distribution Agreement." This appeal followed.

## II

HCNA first argues that the trial court erred in adopting hansaconsult's argument that HCNA's 2009 claims are barred under principles of res judicata and collateral estoppel. Hansaconsult argues that HCNA's claims are barred because the court had decided precisely the same issues and/or causes of action in its September 28, 2010 final order in the previous litigation. The applicability of res judicata is a question of law, which we review *de novo. Brooks v. Trustees of Dartmouth College*, 161 N.H. 685, 690 (2011).

"Res judicata prevents the parties from relitigating matters actually litigated and matters that could have been litigated in the first action." *Morgenroth & Assoc's v. State*, 126 N.H. 266, 269 (1985) (quotation omitted). The doctrine applies if three elements are met: (1) the parties are the same

or in privity with one another; (2) the same cause of action was before the court in both instances; and (3) the first action ended with a final judgment on the merits. *In re Juvenile 2004-637*, 152 N.H. 805, 808 (2005).

Examination of this doctrine reveals that it does not apply here. A cause of action is "the underlying right that is preserved by bringing a suit or action." *Morgenroth*, 126 N.H. at 270 (quotation omitted). HCNA did not bring the same cause of action in this litigation as it did in the 2009 motion to enforce the SPA; there, it sought to enforce the terms of the August 2006 settlement agreement and enjoin hansaconsult's action against it in Germany. And to the extent that the original causes of action between the parties in the 2006 New Hampshire litigation — both hansaconsult's claims and HCNA's counterclaims — mirror HCNA's claims in this action, those claims had been voluntarily non-suited by the parties pursuant to the terms of the SPA. Thus, res judicata does not prevent HCNA from arguing, in this action, that its claims against hansaconsult should be litigated in New Hampshire.

Equally inapposite is the doctrine of collateral estoppel. That doctrine bars a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action. *Petition of Kalar*, 162 N.H. 314, 320 (2011). Under certain circumstances, collateral estoppel may preclude the relitigation of findings made by a previous court when: (1) the issue subject to estoppel is identical in each action; (2) the first action resolved the issue finally on the merits; (3) the party to be estopped appeared in the first action or was in privity with someone who did; (4) the party to be estopped had a full and fair opportunity to litigate the issue; and (5) the finding at issue was essential to the first judgment. *Id.* Even assuming the first four requirements have been met in this instance, the trial court's conclusion in its judgment on the motion to enforce the SPA that all of the parties' underlying legal claims should be heard in Germany was unnecessary to dispose of the issue before it — namely, whether hansaconsult should be required to re-enter settlement negotiations under the SPA. Without having been asked to determine whether the underlying disputes fell within the scope of the forum selection clause, the trial court had no need to answer that question in its final judgment in the SPA enforcement action. Thus, doing so was not essential to the judgment and cannot be given preclusive effect. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27(h), at 258 (1982) ("If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded.").

## III

HCNA's primary argument on appeal is that the trial court erred when it concluded that HCNA's claims against hansaconsult in this action fall within the ambit of the 2001 distribution agreement's forum selection clause and must therefore be brought in Germany. HCNA contends that, although disputes arising out of the distribution agreement must be resolved in Germany, its claims in this action do not so arise. Hansaconsult argues that the forum selection clause language — "Place of Jurisdiction is only Hamburg" — is broad enough to cover "all disputes between the parties arising out of their commercial dealings." The superior court concluded that all of HCNA's claims should be brought in Germany because, "[t]ry as it might, the plaintiff cannot separate this case from the provisions of the Distribution Agreement."

When the trial court has relied on the pleadings to grant a motion to dismiss based upon a question of contract interpretation, such as the scope and application of a forum selection clause, our review is *de novo*. *See In the Matter of Taber-McCarthy & McCarthy*, 160 N.H. 112, 115 (2010).

Disposition of this case requires a precise recitation of the legal claims HCNA has asserted in this action and the underlying allegations upon which those claims are predicated. In its 2009 writ of summons, HCNA makes two general factual allegations, from which it derives five legal claims. First, it alleges that hansaconsult hired John Birnie, a fuel maintenance technician employed by HCNA before the expiration of the distribution agreement, who stole information from HCNA's computer server, including HCNA's trade secrets, relating to "virtually the entire business of HCNA" (the "misappropriation allegation"). Second, it alleges that, *after* the distribution agreement had expired, hansaconsult wrongfully told market participants, including customers and prospective customers of HCNA, that HCNA lacked authority to deal in any leak detection systems that use TCS software — derived from "a once-patented method for checking pipes for fuel leaks" — when in fact HCNA did have such authority ("market representations allegation"). Two of HCNA's legal claims rest solely on the misappropriation allegation: count I, RSA chapter 350-B (violation of the Uniform Trade Secrets Act); and count III, common-law conversion. Two other legal claims rest on both the misappropriation and the market representations allegations: count II, RSA chapter 358-A (violation of the Consumer Protection Act (CPA)), and count V, common-law unfair competition. And one legal claim rests solely on the market representations allegation: count IV, tortious interference with contractual and otherwise advantageous business relations. Our task on review is to determine whether the forum selection clause covers any or all of these claims and their predicate facts.

■ The starting point in analyzing the scope and application of a forum selection clause is the language of the clause itself. Contrary to the general tradition in early American cases of rejecting forum selection provisions, courts after the United States Supreme Court's 1972 decision in *The Bremen v. Zapata Off-Shore Co.* (*The Bremen*) have treated such clauses as presumptively enforceable absent some countervailing reason making enforcement unreasonable. *See The Bremen*, 407 U.S. 1, 12 (1972), *superseded by statute as stated in Outokumpu Engineering Enterprises v. KEPI*, 685 A.2d 724, 733 n.6 (Del. Super. Ct. 1996). In light of the Supreme Court's focus on the many "compelling reasons" why a freely negotiated international agreement should be given full effect, *id.* at 12-14, modern courts look to the language of the clause as evidence of the intent of the parties when they entered the agreement. *See, e.g., Terra Intern. Inc. v. Mississippi Chemical Corp.*, 119 F.3d 688, 693 (8th Cir. 1997) ("Whether tort claims are to be governed by forum selection provisions depends upon the intention of the parties reflected in the wording of particular clauses and the facts of each case." (quotation omitted)); *Ronar Inc. v. Wallace*, 649 F. Supp. 310, 312-13 (S.D.N.Y. 1986) ("The court's goal is to honor the legitimate expectations of the parties to the contract."); *accord* RSA 508-A:3 (2010) (recognizing enforceability of forum selection agreements); *Strafford Technology v. Camcar Div. of Textron*, 147 N.H. 174, 177 (2001) ("It is the intent of the parties that [the forum selection clause statute] seeks to exalt . . . ."). Because the language of the contract is generally controlling, "[d]rawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue." *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997).

■ The clause at issue here — "Place of Jurisdiction is only Hamburg" — provides little guidance as to the scope of possible non-contract-based disputes the parties intended to litigate in Hamburg. In the first instance, we decline hansaconsult's invitation to read that clause to cover "all disputes between the parties arising out of their commercial dealings," as that expansive reading would require any "commercial" disputes arising between these two businesses to be litigated in Germany, regardless of either the logical relation of those disputes to the contract or even the continued existence of a binding agreement between the parties. In the absence of language signaling which, if any, extra-contractual disputes are to be heard in a foreign tribunal, courts have generally assumed an intent that only disputes "arising under" the contract are subject to the forum selection clause. *See, e.g., Terra International*, 119 F.3d at 693; *cf. Stewart Organization, Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (en

banc) (broad reading of forum selection clause referring to any case or controversy "arising under *or in connection with*" the agreement (emphasis added)). We adopt the reasoning of those decisions: applying a contractual forum selection provision to parties' general commercial relationship after the contract's expiration or outside the scope of the contract would upset the legitimate expectations of the contracting parties and would encompass a potentially unforeseeable range of noncontractual disputes. *Cf. The Bremen*, 407 U.S. at 17-18; *Terra International*, 119 F.3d at 695. Limiting the reach of such generic forum selection provisions to disputes involving the rights and obligations that the contract itself creates will give effect to the most likely intent of the parties and help foster stable and predictable commercial relationships.

Our review of the law in other jurisdictions reveals several predominant approaches to the question of whether non-contractual claims "arise under" the contract for the purposes of a forum selection provision. The First Circuit Court of Appeals, in *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993), adopted a rule in 1993 that "contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties." In that case, Lambert, a Massachusetts-based Christmas tree retailer, asserted in a Massachusetts forum both contract and tort claims against the Kysars, Washington State-based tree farmers. The two parties had signed a contract containing a forum selection provision designating Washington as the exclusive place of jurisdiction for their disputes. Applying its "same operative facts" test, the court rejected Lambert's attempt to evade the forum selection clause by alleging tortious conduct relating to the formation, rather than the performance, of the contract. *Id.* at 1121-22.

Somewhat differently, the Second Circuit focuses on whether the plaintiff's rights originate from the contract; if the plaintiff has not asserted a right or duty under the contract, then the claims fall outside the scope of the forum selection clause. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 391-92 (2d Cir. 2007). In *Phillips*, an American musician and an English recording studio entered into an agreement containing a forum selection clause designating England as the place of jurisdiction for "any legal proceedings that may arise out of [the agreement]." *Id.* at 382. The musician, known as "Pete Rock," sued under a copyright theory in an American court, arguing that the defendants released his copyrighted work under their label without his permission. *Id.* at 390. The defendants argued that the contract itself permitted their use of his songs and invoked the forum selection clause as a bar to venue in the American forum. *Id.* at 391. The court allowed the plaintiff to proceed with his copyright claim:

"Because the recording contract is only relevant as a defense in this suit, we cannot say that Phillips' copyright claims originate from, and therefore arise out of, the contract." *Id.*

The Seventh Circuit phrases its test in a way that likely encompasses a wider range of non-contractual claims and facts within a contract's forum selection provision than do the First and Second Circuits; that circuit asks whether resolution of a dispute "arguably depend[s] on the construction of an agreement." *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994). The American company in that case had sued a British company with whom it had recently ended a distribution agreement, asserting that the British company violated its trademark. In contrast to *Phillips*, the *Omron* court looked beyond the plaintiff's asserted claims and factual allegations, noting that the underlying facts, though taking place after the expiration of the contract, were tied up in contract law. *See id.* at 602 (observing that, although the contract itself did not specify how to wrap up the parties' relations after the contract expired, common-law gap-filling rules nevertheless applied). Because the plaintiff's claims arguably depended on the construction of the contract, the dispute had to be heard entirely in the selected forum. *See id.*; *see also Sweet Dreams Unlimited v. Dial-A-Mattress Intern.*, 1 F.3d 639, 642-43 (7th Cir. 1993) (applying the same test to the scope of arbitration clauses).

Other circuits and jurisdictions have adopted slightly different tests in this context. The Ninth Circuit, analyzing somewhat broader language than that contained in the contract here, asks whether the plaintiff's claims "cannot be adjudicated without analyzing whether the parties were in compliance with the contract." *Manila Industries, Inc. v. Ondovo Ltd. Co.*, 334 Fed. Appx. 821, 823 (9th Cir. 2009); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988). The Third Circuit concluded that a forum selection clause applied to a plaintiff's tort claims when they "ultimately depend on the existence of a contractual relationship." *Coastal Steel v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983), *overruled on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989). *But see Jitterswing, Inc. v. Francorp, Inc.*, 311 S.W.3d 828, 830 (Mo. App. 2010) (holding that a forum selection clause does not require tort claims between parties to a contract to be litigated in the selected forum despite the plaintiff's allegation that the defendant had committed tortious actions "under the agreement").

■ We conclude that the First Circuit's analysis best effectuates the legitimate expectations of contracting parties and adopt its reasoning in this state. The Second Circuit's test, by asking whether the rights of the claims originate in the contract, may allow savvy plaintiffs to disguise what

could be contract-based claims as statutory or common-law tort claims, even if the parties would have expected to litigate such disputes in the selected forum. As the First Circuit noted in *Lambert*, courts should not "reward attempts to evade enforcement of forum selection agreements through artful pleading of [non-contract] claims in the context of a contract dispute." *Lambert*, 983 F.2d at 1121 (quotation omitted); *see also Forrest v. Verizon Communications, Inc.*, 805 A.2d 1007, 1014 (D.C. Cir. 2002) (adopting *Lambert* test). In contrast to the Second Circuit, the Seventh Circuit's focus on any claims that "arguably" require interpretation of a contract could permit defendants to enforce a forum selection provision by raising flimsy contract-based defenses to non-contract-based claims that otherwise would fall outside the scope of the provision, thus thwarting the intent of the parties when they entered their agreement. In asking whether the plaintiff's non-contract tort or statutory claims involve the same operative facts as parallel claims for breach of contract, the First Circuit's test allows courts to examine the claims and facts side-by-side and to determine which disputes can fairly be considered to "arise under" the contract.

■ Applying this test to the instant case, we conclude that the superior court correctly determined that HCNA's misappropriation allegations, and the claims originating from them, arise under the contract and should be brought in a German forum. The contract contains the following provision entitled "Business and Trade Secrets":

> Both parties must not use nor inform third parties about business and trade secrets of each other getting known to them during the cooperation without prior written approval of the referring party. This term remains in effect after termination of contract.

The misappropriation allegations in HCNA's writ state that, before he left HCNA but after he was hired by hansaconsult, Birnie downloaded the contents of HCNA's computer server, and, with this information in hand, hansaconsult "undertook . . . to compete with HCNA for U.S. business." Although HCNA has used the misappropriation allegation to level four *non-contract*-based tort and statutory claims (counts I, II, III and V), the very same set of operative facts — stealing HCNA's proprietary information, *i.e.* trade secrets, during the course of their contractual relationship and using them in the marketplace — could have been brought as a claim for breaching the above-quoted provision of the contract. That some of the underlying facts, such as hansaconsult's allegedly wrongful use of that information, occurred after the termination of the distribution agreement

on December 31, 2005, does not remove the claims from the forum selection provision because the trade secrets clause expressly provides for post-agreement disputes of this nature.

In contrast, we perceive no parallel breach of contract claim involving the same operative facts underlying the market representations allegations. In its writ, HCNA alleges that hansaconsult told HCNA's customers and potential customers that HCNA lacked authority to "supply, maintain, support, test and certify leak detection systems that contain, as one of their component parts, the TCS software." On that basis, HCNA advanced three legal theories: count II, violation of the CPA; count IV, tortious interference with contractual and otherwise advantageous business relations; and count V, common-law unfair competition. Although the distribution agreement contains a provision stating that HCNA must stop referring to itself as a dealership of hansaconsult after the expiration of the contract, that provision does not provide HCNA with a parallel claim for breach of contract *against* hansaconsult based on the market representations allegations. In any case, viewed in a light most favorable to the nonmoving party, that provision does not, on its face, provide a defense to the specific allegation that hansaconsult wrongfully told other market participants that HCNA lacked authority to deal in TCS software. Thus, HCNA's market representations claims cannot be said to arise under the contract for the purpose of the forum selection clause.

 Three additional considerations support our conclusion as to the market representations allegation. The first is that HCNA could not fairly have anticipated, when it signed the contract containing the forum selection clause, litigating a claim against hansaconsult arising solely out of their relationship as market competitors rather than as business co-venturers. In contrast, HCNA could have anticipated litigating its misappropriation-based claims, involving as they do allegations that hansaconsult stole HCNA's trade secrets, because the contract expressly imposed obligations on both parties as to the use of trade secrets before and after the contract. The second consideration is that HCNA could not have used its market representations allegations to evade the forum selection clause through artful pleading because no alternative pleading of those facts and their attendant legal theories would give rise to a claim for breach of the distribution agreement. *See Farmland Industries v. Frazier-Parrott Commodities*, 806 F.2d 848, 852 (8th Cir. 1986). While courts should take care not to reward artful pleading of disputes that, in reality, could be brought as contract claims and should be litigated in the forum selected by the parties, they must also avoid extending forum selection provisions beyond their intended scope. The final consideration is that contracting parties

remain free, as always, to draft forum selection arrangements in more specific terms than the one at issue in this case and thereby avoid any rule we promulgate. *See, e.g., Wyeth*, 119 F.3d at 1074-75 (reasoning that the phrase "arising in relation to" is broader than the phrase "arising under" because the former clause extends to any action having some "logical or causal connection" to the agreement, while the latter covers disputes "growing out of" the agreement).

In light of the foregoing discussion, we affirm the superior court's dismissal of the plaintiff's misappropriation-based claims, but reverse its dismissal of the plaintiff's market representations-based claims and remand those claims for trial.

## IV

■■ HCNA also argues that it was denied due process when the court granted hansaconsult's motion to dismiss *sua sponte* and without HCNA having had an opportunity to oppose the motion. Even assuming that the trial court's *sua sponte* disposition of hansaconsult's stayed motion to dismiss was error, however, it would not follow that HCNA's right to due process had been violated. HCNA had sufficient notice and an opportunity to be heard when it filed its motion for reconsideration. *Cf. Exeter Hospital v. Hall*, 137 N.H. 397, 399-400 (1993).

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.