**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2019-0042, <u>In the Matter of Karen Kilcup and Christopher Chimera</u>, the court on October 11, 2019, issued the following order:**

Having considered the briefs and record submitted on appeal, we conclude that oral argument is unnecessary in this case. <u>See</u> <u>Sup. Ct. R.</u> 18(1). We affirm.

The respondent, Christopher Chimera (husband), appeals an order of the Circuit Court (<u>Pendleton</u>, J.) on his post-final-decree "petition to bring forward and motion for contempt and clarification" in his divorce from the petitioner, Karen Kilcup (wife). He contends that the trial court erred by: (1) terminating an evidentiary hearing "without complete testimony from either party"; (2) misinterpreting the parties' permanent stipulation, which was incorporated into the court's final decree; and (3) denying his motion to amend his petition while allowing the wife to question him regarding his infidelity.

When reviewing a trial court's decision rendered after a hearing on the merits, we uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous. <u>O'Malley v. Little</u>, 170 N.H. 272, 275 (2017). We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence. <u>Id</u>. Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. <u>Id</u>. We review the trial court's application of the law to the facts <u>de novo</u>. <u>Id</u>.

We first address whether the trial court erred by terminating the evidentiary hearing. The husband argues that, because his attorney had not completed redirect examination or cross-examined the wife, the trial court: (1) denied him due process under the Federal and New Hampshire Constitutions; and (2) unsustainably exercised its discretion.

We assume, without deciding, that the husband's due process argument is preserved. A party may not prevail upon a due process claim absent a showing of actual prejudice. <u>McIntire v. Woodall</u>, 140 N.H. 228, 230 (1995). In this case, the husband failed to show that he was actually prejudiced by the termination of the hearing because he failed to articulate specifically, either at the close of the hearing or in his motion for reconsideration, what additional evidence he would have sought to elicit had he been provided with more time to examine the witnesses.

See Vincent v. MacLean, 166 N.H. 132, 137 (2014) (stating that plaintiff failed to show prejudice to establish due process violation based upon inability to admit exhibits or adequately question defendant because he did not identify additional documents he wished to submit or present substance of any questions he would have posed to the defendant); In the Matter of Sawyer & Sawyer, 161 N.H. 11, 17 (2010) (stating defendant failed to establish actual prejudice due to domestic violence petition's lack of specific dates of abuse because he did not proffer any evidence indicating that he in fact had a time-based defense that he would have presented had he known the alleged dates prior to the hearing).

The husband further argues that the trial court unsustainably exercised its discretion by denying his request to continue the hearing. A trial court has broad discretion in managing proceedings before it. Achille v. Achille, 167 N.H. 706, 713 (2015). We will disturb decisions about motions to continue only if the appellant demonstrates that the decision was clearly unreasonable to the prejudice of his case. Id.

In this case, approximately nine months before the hearing, the husband's attorney requested a two-hour hearing; approximately three months before the hearing, he received notice that the hearing was scheduled for two hours. However, the husband did not request additional time until the hearing ended. The hearing, in fact, lasted approximately two hours and 40 minutes; the husband testified on direct examination for approximately one hour and 20 minutes of that time and on cross-examination and redirect for all but approximately the final 10 minutes of the hearing. Neither at the end of the hearing nor in his motion for reconsiderations did the husband identify further evidence that he intended to elicit from the witnesses.

The husband cites cases from other jurisdictions adjuring trial courts to "not sacrifice their primary goal of justice by rigidly adhering to time limits in the name of efficiency." In re Marriage of Ihle, 577 N.W.2d 64, 68 (Iowa Ct. App. 1998). However, in the case at hand, the trial court did not rigidly adhere to its schedule, but, in fact, allowed the husband significantly more time to present his case than he had requested in advance. See id. at 69 (upholding trial court's discretion in ending hearing, in part, because appellant failed to identify any problems in managing allotted trial time, used considerably more time than opposing party, and failed to make offer of proof to show prejudice).

The husband relies upon the trial court's comment that it had been presented with a "rather complex jumble of issues," but ignores its further conclusions that the "documents . . . speak for themselves," and that it understood the issues and thought they were "fairly simple." In its order, the trial court noted that it had "obtained significant documentary evidence and received significant testimony primar[il]y from the [husband]." Upon this record, we conclude that the husband has failed to show that the trial court's decision not to continue the hearing was unreasonable. See Achille, 167 N.H. at 713.

We next address whether the trial court erred in its interpretation of the parties' permanent stipulation. At the time of the divorce, both parties were represented by counsel. The husband testified that he and the wife negotiated the terms of a final stipulation and that "[t]here were drafts going back and forth." Eventually, the parties reached an agreement, and the husband signed the permanent stipulation, which provided that the parties "believe that this is a fair and reasonable resolution of all the issues related to our marriage." The husband signed the permanent stipulation in October 2015, and the trial court incorporated it into its final order on February 7, 2016. The husband did not move for reconsideration of or appeal the final order. He did not move for clarification or otherwise contest the order until September 2017.

The husband contends that the trial court misinterpreted the stipulation by concluding that: (1) it awarded the parties' joint investment accounts to the wife; and (2) the personalty had been divided, while allowing the husband ten days from the hearing in which to request any additional personalty, subject to the wife's approval.

The husband's arguments require that we interpret the permanent stipulation. A stipulated agreement is a contract and, therefore, is governed by contract rules. In re Taber-McCarthy, 160 N.H. 112, 115 (2010). The interpretation of a contract is a question of law, which we review de novo. Id. When interpreting a written agreement, we give the parties' language its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. Id. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract. Id.

The language of a contract is ambiguous if the parties to it could reasonably disagree as to the meaning of that language. Id. If the agreement's language is ambiguous, it must be determined, under an objective standard, what the parties, as reasonable people, mutually understood the ambiguous language to mean. Id. In applying the objective standard, a court should examine the contract as a whole, the circumstances surrounding its execution, and the object intended by the agreement, while keeping in mind the goal of giving effect to the parties' intention. Id. at 115-16.

We first consider the joint investment accounts. The stipulation required the wife to pay the husband alimony and to pay for his health and motor vehicle insurance for five years, and to pay him $618,000 as a property settlement. Under the caption "Investment Accounts," it awarded "[e]ach party . . . their individual investment accounts," but did not mention jointly held investment accounts. Under the caption "Checking Savings," it awarded each party "their individual checking/savings account," and awarded the wife "the balance of any of the jointly held bank/money market accounts as reflected on the attached exhibit of accounts." The "exhibit of accounts" was not attached to the

3

permanent stipulation that the trial court approved. The husband argues that the stipulation's failure to directly address "joint investment accounts was an omission."

The trial court rejected this argument, finding that the parties had "a clear understanding of what accounts were covered by the Final Decree," that the stipulation awarded the joint investment accounts at issue to the wife, and that the husband's claim regarding the joint investment accounts was "wholly without merit." It based these findings on the language of the stipulation and on the parties' intent as shown by their actions.

Both parties testified that, during the marriage, the husband participated in managing the investment accounts. The wife listed the joint investment accounts as assets on her financial affidavit. Although the husband has not provided a copy of his financial affidavit, the trial court found that he did not list the joint investment accounts as his assets. See Bean v. Red Oak Prop. Mgmt., 151 N.H. 248, 250 (2004) (stating that, when appellant fails to provide a complete record, we assume that evidence was sufficient to support trial court's finding). We note that the husband did not file his financial affidavit until approximately six months after the final order, giving him ample time to review the order for any errors or omissions.

The record reflects that the husband first challenged the wife's receipt of the joint investment accounts approximately 18 months after the final order. Until that time, the husband's actions reflected an understanding that the joint investment accounts were awarded to the wife. For example, approximately three months after the final order, the husband's attorney e-mailed the wife's attorney stating that the husband had "most of the paperwork completed to close the bank accounts," but that "[s]ome documents require a 'medallion signature guarantee.'" A subsequent e-mail from the husband to his attorney clarified that the "medallion signature guarantee" was required by the company holding two of the joint investment accounts.

The husband's e-mail also stated that when he had telephoned the company holding the joint investment accounts, he had been told that the wife had provided the wrong forms. A different section of the husband's e-mail referred to removing his name from joint bank accounts. Approximately three days after this e-mail, the wife e-mailed the husband directly, stating that she had "called [the holder of the investment accounts] and asked them what documents were required to remove your name from our accounts." She also referred to the bank accounts separately. Neither the husband nor his attorney questioned that the husband had to remove his name from the joint investment accounts.

Approximately 14 months after the final order, the wife wrote to the husband, requesting the "completed paperwork to remove your name from the [joint investment] accounts." She further stated that she needed this so she

could send him a portion of his property settlement. She noted that "[t]he [two joint investment] accounts and the house value far exceed the value of this settlement amount." The husband continued not to challenge the wife's right to the joint investment accounts for approximately four more months, until he acquired new counsel. The husband accepted his property settlement and more than a year's alimony pursuant to the final stipulation before raising this challenge to it. The husband offers no explanation for this delay.

The husband asserts that awarding the wife the joint investment accounts "skewed the property division heavily in [her] favor." However, the record does not include the husband's financial affidavit or an accounting of value of the property distributed to the wife or to the husband. The trial court questioned the husband's failure to call as a witness his former attorney, who participated in drafting the final stipulation, to testify to the intended distribution.

The husband argues that, if the parties intended the wife to receive the joint investment accounts, the stipulation could have awarded her all joint accounts without distinguishing between "investment accounts" and "checking savings." The mere fact that the stipulation could have been drafted differently does not mean that, as drafted, it did not award the joint investment accounts to the wife. Moreover, we note that the parties' nomenclature in classifying accounts is not consistent. For example, under the stipulation's caption "Checking Savings," the parties referred to "checking/savings" accounts and "bank/money market accounts" apparently interchangeably. On her financial affidavit, the wife identified bank accounts, certificates of deposit, and credit union shares as "cash." Similarly, at the hearing, the husband testified that one of the contested investment accounts was "gold depository storage," while the wife's attorney referred to it as a "money market investment-type account."

The trial court's factual finding that the parties had "a clear understanding of what accounts were covered by the Final Decree" is supported by the evidence. Viewing the stipulation as a whole, we conclude that the distribution of individual accounts to the owner of them and joint accounts to the wife, rather than the nomenclature used to characterize accounts, reflects the parties' mutual intent. See Taber-McCarthy, 160 N.H. at 115-16.

We next consider the division of personalty. The permanent stipulation awarded the wife all personalty inherited from her parents and both houses owned by the parties. It awarded the husband all his personal items and his parents' furniture. It then provided that "[f]ollowing a mutually agreed-upon date for walk-through, [the husband] shall submit a list of additional personal property items to [the wife] within a reasonable time period."

The husband completed his "walk-through" of one house in June 2017, approximately 14 months after the final order, and of the other house in March 2018, over two years after the final order. He acknowledged that he removed

5

"two U-Haul trucks" full of personalty from the first home. He testified that at no time did he provide the wife with a list of additional personalty that he wished to receive. Regardless of the husband's excuses for his failure to provide the required list, he did not do so within a "reasonable time" after his "walk-throughs." Accordingly, we conclude, as the trial court did, that the parties' intent, as reflected in the final stipulation, was that the husband's right to additional personalty would terminate after the expiration of a "reasonable time" following the "walk-throughs." See id.

In spite of finding that "the personal property . . . is now divided," the trial court allowed the husband ten days to submit a list of additional property he wanted, with his receipt of such items contingent upon the wife's agreement. The husband complains about these terms. However, given that this opportunity was outside the terms of the permanent stipulation, it rested in the trial court's discretion, which, on this record, we cannot conclude it exercised unreasonably. See RSA 490-D:3 (2010) (giving family division equity powers when it has subject matter jurisdiction); see also RSA 490-F:3 (Supp. 2018) (granting circuit court jurisdiction conferred upon former judicial branch family division).

Finally, we address whether the trial court erred by allowing the wife to question him regarding his marital infidelity. We will not reverse the trial court's decision to admit evidence absent an unsustainable exercise of discretion. Barking Dog, Ltd. v. Citizens Ins. Co. of America, 164 N.H. 80, 86 (2012). Furthermore, in this case, the trial court was not bound by the technical rules of evidence. See Fam. Div. R. 2.2. Having reviewed the transcript, we cannot say that the trial court's decision not to sustain the husband's objection to the two questions regarding his infidelity was clearly untenable or unreasonable to the prejudice of his case. See Barking Dog, 164 N.H. at 86.

To the extent that the husband intends to challenge the denial of his motion to amend his petition for clarification to add a claim to set aside the permanent stipulation due to fraud or duress, see Shafmaster v. Shafmaster, 138 N.H. 460, 461 (1994), the trial court was within its discretion to deny the motion because it sought relief on a new theory approximately 11 months after the petition was filed and less than one month before the evidentiary hearing. See Thomas v. Tel. Pub. Co., 151 N.H. 435, 439 (2004) (stating that trial court has discretion to deny amendment introducing new cause of action or calling for substantially different evidence).

Affirmed.

Hicks, Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Eileen Fox,
Clerk**

6